UNITED STATES, Appellee,

v.

Captain Lawrence P. ROCKWOOD II,
United States Army, Appellant.

ARMY 9500872.

U.S. Army Court of Criminal Appeals.

9 Feb. 1998.

502

For Appellant: Ramsey Clark (argued); Lawrence W. Schilling; Captain Eric S. Krauss, JA (on original brief); Ramsey Clark; Lawrence W. Schilling; Captain John M. Head, JA (on supplemental brief); Colonel John T. Phelps II, JA; Captain Jodi E. Terwilliger–Stacey, JA.

For Appellee: Captain John M. Bergen, JA (argued); Lieutenant Colonel Eva M. Novak, JA; Major Virginia G. Beakes, JA (on brief); Colonel Joseph E. Ross, JA.

Before COOKE, TOOMEY and CARTER, Appellate Military Judges.

## OPINION OF THE COURT

CARTER, Judge.

A general court-martial composed of officers convicted the appellant, contrary to his pleas, of failure to go to his appointed place of duty, leaving his appointed place of duty, disrespect to a superior commissioned officer, willfully disobeying a superior commissioned officer, and conduct unbecoming an officer in violation of Articles 86, 89, 90, and 133, Uniform Code of Military Justice, 10 U.S.C. §§ 886, 889, 890, and 933 (1988) [hereinafter UCMJ].[1] The court-martial adjudged a sentence of dismissal and forfeiture of all pay and allowances. The successor convening authority[2] disapproved the finding of guilty of conduct unbecoming an officer, approved the remaining findings of guilty, and approved a sentence to forfeiture of $1500.00 pay per month for two months and a dismissal. This case is before the court for automatic review under Article 66, UCMJ.

Appellant raises six assignments of error, all of which we decide against him.

---

1. The members found the appellant not guilty of failure to obey an order and dereliction of duty in violation of Article 92, UCMJ, as well as significant portions of the conduct unbecoming an officer specification.

2. The 10th Mountain Division changed commanders after referral of the charges but prior to action.

## I.

CPT ROCKWOOD WAS DENIED A FAIR AND IMPARTIAL TRIAL AS A RESULT OF INTERRELATED UNLAWFUL COMMAND INFLUENCE AND CONFLICTS OF INTEREST AFFECTING VIRTUALLY THE ENTIRE COMMAND, INCLUDING THE COURT AND PANEL MEMBERS AND PROSECUTION WITNESSES.

## II.

INDIVIDUAL MEMBERS OF THE MILITARY COURT WERE DISQUALIFIED FROM SERVICE ON THE COURT.

## III.

THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH BEYOND A REASONABLE DOUBT THAT CPT ROCKWOOD WAS GUILTY OF CHARGES I, II, OR III [all of the approved charges].

## IV.

THE MILITARY JUDGE ERRED BY FAILING TO INSTRUCT THE PANEL ON THE JUSTIFICATION DEFENSE, THE APPLICABILITY OF COMMAND INTENT AND INTERNATIONAL LAW TO THE ACTS ALLEGED AND ERRONEOUSLY INSTRUCTED THE PANEL ON DURESS.

## V.

THE MILITARY JUDGE ABUSED HIS DISCRETION BY DENYING PRODUCTION OF MAJOR GENERAL MEADE, BRIGADIER GENERAL HILL, MR. MICHAEL LEVY, OTHER WITNESS TESTIMONY AND EVIDENCE RELEVANT AND NECESSARY TO ESTABLISH CAPTAIN ROCKWOOD'S DEFENSES.

## VI.

THE SENTENCE OF DISMISSAL IS ERROR.

The events underlying the charges in this case occurred in Haiti during the initial stages of Operation Uphold Democracy. There is no substantial question about what appellant did. The principal issue is whether he had a legal justification or excuse for his actions.

On 31 July 1994, the United Nations (U.N.) Security Council determined that the situation in Haiti was a threat to the peace and security of the region. Acting under Chapter VII of the Charter of the United Nations, the Security Council authorized U.N. Member States to form a multinational task force (MNF) "to use all necessary means to facilitate the departure from Haiti of the military leadership, ... the prompt return of the legitimately elected President [President Aristide] and the restoration of the legitimate authorities of the Government of Haiti, and to establish and maintain a secure and stable environment...." United Nations Security Council Resolution 940, U.N. SCOR, 3413 mtg. (1994) [hereinafter U.N. S.C. Res. 940].

On 19 September 1994, with a MNF invasion of Haiti imminent, a team led by former President Carter negotiated an agreement with the ruling military government in Haiti which permitted the peaceful entry into Haiti of a MNF to accomplish the aims of U.N. S.C. Res. 940. Elements of the 10th Mountain Division immediately began deploying into Haiti on 19 September 1994 as part of Joint Task Force (JTF) 190. The Haitian military government was to remain in place until the agreed return of President Aristide's government on 15 October 1994.

Appellant was a counter intelligence officer with the 10th Mountain Division's Office of the Assistant Chief of Staff for Intelligence (G2). He deployed to Haiti on 23 September 1994. Appellant was personally concerned about intelligence reports which reflected deplorable conditions at the National Penitentiary in Port au Prince. He attempted to initiate a JTF inspection of the National Penitentiary by raising the issue with his superiors on the joint intelligence staff, a captain in the staff judge advocate's office, and the division chaplain. Appellant considered the JTF's inaction toward the National Peniten-

tiary to be contrary to President Clinton's intent[3] and a violation of the JTF's obligation under international law to protect human rights.

On 29 September 1994, a grenade attack near the Haitian Presidential Palace killed several Aristide supporters and injured many others. As a result of this attack, Major General (MG) Meade (the 10th Mountain Division commander and the general court-martial convening authority who referred these charges to trial) increased operational and counter intelligence efforts to identify the attackers and to safeguard American forces.

Appellant disagreed with the decision to increase operational security instead of immediately inspecting the National Penitentiary. On the morning of 30 September 1994, he filed a formal complaint with the 10th Mountain Division Inspector General (IG) requesting that the IG "[i]nform the commanding general as soon as possible of facts that may lend the appearance that the JTF is indifferent to probable ongoing human rights

violation[s] in PAP [Port au Prince, or National] Penitentiary." Appellant's complaint explained his concerns: "Per the intent of the U.N. resolution and the primary 'cause ad bellum' [that] our President addressed to the Nation for our [ ] military presence, indifference to ongoing human rights violation[s] in our direct proximity appears to me to be a subversion of that intent."

Later that day, appellant decided, without command authorization, to "inspect" the National Penitentiary. Appellant did not go to his appointed place of duty when his shift began that evening because he had gone to the prison without authority. Later, after appellant's return from the prison, Lieutenant Colonel (LTC) Bragg[4] ordered appellant admitted to the local combat support hospital for psychiatric evaluation.[5] Appellant left the hospital without permission, contrary to an order from the psychiatrist evaluating him, to tell LTC Bragg what he saw at the prison. During this discussion, appellant repeatedly and disrespectfully yelled at LTC

3. Appellant watched President Clinton's televised address to the nation on 15 September 1994. He recalled the President stating that one of the reasons for U.S. involvement in Haiti was "to stop the brutal atrocities" that were occurring in Haiti. Appellant did not recall seeing a televised news conference on 19 September 1994, at which President Clinton said, "My first concern, and the most important one, obviously, is for the safety and security of our troops. General Shalikashvili and Lieutenant General Hugh Shelton, our commander in Haiti, have made it clear to all involved that the protection of American lives is our first order of business."

4. Lieutenant Colonel Bragg served as the Assistant Chief of Staff for Intelligence (G2) for the 10th Mountain Division, the Director of Intelligence for JTF 190, and the Assistant Chief of Staff for Intelligence (J2) for the multinational forces. Appellant worked for LTC Bragg.

5. Appellant's actions caused LTC Bragg to have concerns about appellant's mental health. Prior to going to the prison, appellant, a Tibetan Buddhist, left a note on his bunk quoting Buddhist sacred text about making "a gift of my body." The note continued, "I have done what is legal to stop something that is plainly illegal. No[w] you coward[s] can court-martial my dead body." Appellant's note concluded that the "action required" was "All means necessary to implement the intent of the UN and U.S. President[']s intent

on Human Rights. Take this flag, it is soiled with unnecessary blood." Appellant fastened a U.S. flag patch (normally worn on the battle dress uniform to identify U.S. forces) in an upside down position to his note with a safety pin. He subsequently "inspected" the National Penitentiary with a loaded M–16 rifle. The Haitian prison officials summoned the military attaché from the U.S. Embassy for assistance in disarming appellant. The attaché ultimately persuaded appellant to unload his weapon and leave the prison. Although not raised by either party, we did consider the National Defense Authorization Acts for Fiscal Years 1991 and 1993 (Pub.L. No. 101–510 § 554, 104 Stat. 1485, 1567–69 (1990) and Pub.L. No. 102–484, § 546, 106 Stat. 2315, 2416–19 (1992)) (codified at 10 U.S.C. § 1074), which established procedures for commanders to follow when referring servicemembers for mental health evaluations (see Administrative Law Note, *Mental Health Evaluations*, The Army Lawyer 32–34 (December 1997) for a more complete discussion of this legislation and implementing regulations). The legislation was concerned with the inappropriate referral for a mental health evaluation of a servicemember as a reprisal against the member for certain whistle-blower type communications that could include filing an IG complaint. Using our fact-finding authority under Article 66, UCMJ, we find that LTC Bragg's emergency referral in this case was appropriate, was based upon his genuine concern for appellant's mental health, and was not a reprisal for appellant's IG complaint.

Bragg and disobeyed orders to be "at ease" and to "be quiet."

At trial and before us, appellant argued he was legally justified in going to the prison, failing to report for duty, leaving the hospital without permission, and disobeying and talking to his superior officer in a disrespectful manner. Because appellant's claim of justification affects most of the assigned errors, we address that issue first.

### JUSTIFICATION

Appellant asserts that his otherwise criminal acts were justified because (1) he was following the command intent of the Commander–in–Chief; and (2) he had an affirmative, individual duty under international law to act as he did. The prosecution and defense each presented expert testimony and other evidence before the members concerning whether appellant had any legal duty to act.[6] Appellant requested instructions on the separate defenses of justification and duress. After lengthy discussions throughout the record, the military judge denied any instruction on a justification defense, but did instruct the members on the defense of duress.[7]

Appellant's defense of justification is based on Rule for Courts–Martial 916(c) [hereinafter R.C.M.]: *"Justification.* A death, injury, or other *act caused or done in the proper performance of a legal duty* is justified and not unlawful" (emphasis added). Statute, regulation, or order may impose this legal duty. R.C.M. 916 discussion. Thus, the key issue in this case is whether appellant acted pursuant to a legal duty.

### Determination of Legal Duty

■ The determination of whether a "legal duty" exists in a potential justification situation is a question of law to be determined by the trial judge. UCMJ art. 51(b); *United States v. Cottier,* 759 F.2d 760, 763 (9th Cir.1985); *United States v. Dorrell,* 758 F.2d 427 (9th Cir.1985); *see also United States v. Calley,* 46 C.M.R. 1131, 1183, 1973 WL 14570 (A.C.M.R.) (lawfulness of a superior's order is a question of law), *aff'd,* 22 U.S.C.M.A. 534, 48 C.M.R. 19, 1973 WL 14894 (C.M.A.1973). In essence, the evidence must, as a matter of law, reach a minimum threshold before a trial judge is required to give an instruction on a defendant's theory of an affirmative defense. "[I]t is essential that the testimony given or proffered meet a minimum standard as to each element of the defense so that, if a jury finds it to be true, it would support an affirmative defense—here that of duress and necessity." *United States v. Bailey,* 444 U.S. 394, 414–15, 100 S.Ct. 624, 637, 62 L.Ed.2d 575 (1980).

The military judge in this case never expressly ruled, as a matter of law, whether or not the evidence established that appellant acted pursuant to a legal duty.[8] We will examine each of appellant's claimed sources of this legal duty to determine whether the evidence met the minimum threshold to entitle him to an instruction on the affirmative defense of justification.

### Commander-in-Chief's Intent

■ We reject appellant's claim that his actions were done in the proper performance of a legal duty because he was following the command intent of the President as outlined in his 15 September 1994 speech to the nation. Individual servicemembers do not divine their orders from televised speeches of the President. The President gives a speech

---

6. The defense expert evidence consisted primarily of the testimony of Francis A. Boyle, Professor of International Law, University of Illinois College of Law in Champaigne, Illinois. The government called William H. Parks, Special Assistant for Law of War Matters and the Chief of the Law of War Branch, International and Operational Law Division, Office of the Judge Advocate General, U.S. Army, as a rebuttal expert witness.

7. Appellant's fourth assignment of error is that the military judge erred by failing to instruct on "the justification defense ... and erroneously instructed the panel on duress." With respect to

duress, appellant's brief is unclear whether he contends the instruction was an inadequate substitute for the justification defense; inappropriate altogether; or incorrect in its particulars. For the reasons discussed in our opinion, we find this instruction was not erroneous.

8. The military judge's decision not to instruct on the defense of justification indicates that, implicitly, he concluded that no legal duty existed. Because we agree with this conclusion, the judge's failure to rule expressly does not entitle appellant to any relief.

to the nation concerning military action to explain why he is sending America's sons and daughters into harm's way and to elicit political and public support for the endeavor. A President's public comments do not constitute operational orders. The President issues his operational orders, including his concept of the operation as Commander–in–Chief, through the National Command Authority[9] down the chain of command to the appropriate operational commander. The commander of the operation then issues implementing orders to the individual commanders and members of the armed forces involved in the operation. Appellant was an experienced soldier with over fourteen years of active military service. He knew the proper channels for receiving orders.

Even if a soldier is convinced that his superiors have misinterpreted the mission, his recourse is to seek clarification or correction through the chain of command, to include, if necessary, seeking to discuss it personally with the commander concerned.[10] Appellant did attempt to persuade his superiors on the joint intelligence staff of the need for an immediate inspection of the National Penitentiary. However, these unsuccessful efforts did not entitle appellant to take action on his own without command authorization.

An individual soldier is not free to ignore the lawful orders or duties assigned by his immediate superiors.

For there would be an end of all discipline if the seamen and marines on board a ship of war [or soldiers deployed in the field], on a distant service, were permitted to act upon their own opinion of their rights [or their opinion of the President's and United Nations' intent], and to throw off the authority of the commander whenever they supposed it to be unlawfully exercised.

*Dinsman v. Wilkes,* 53 U.S. (12 How.) 390, 403, 13 L.Ed. 1036 (Dec. Term, 1851).[11] A servicemember is obligated to obey an order unless it requires him to do an obviously illegal act or is patently beyond the issuer's authority.

Where the order is apparently regular and *lawful on its face,* he is not to go behind it to satisfy himself that his superior has proceeded with authority, but is to obey it according to its terms, *the only exceptions recognized to the rule of obedience being cases of orders so manifestly beyond the legal power or discretion of the commander as to admit of no rational doubt of their unlawfulness.*

*Calley,* 22 U.S.C.M.A. at 543, 48 C.M.R. at 28 (quoting W. Winthrop, *Military Law and Precedents,* 296–97 (2d ed. 1920 Reprint) [hereinafter Winthrop]) (emphasis in original). In plain language, a soldier disobeys an order at his own peril.[12]

The success of any combat, peacekeeping, or humanitarian mission, as well as the per-

---

9. The National Command Authorities consist of the President and the Secretary of Defense or their duly deputized alternatives or successors. Joint Chiefs of Staff Publication 1, Department of Defense Dictionary of Military and Associated Terms (1 June 1987) at page 243.

10. This is not to suggest that a soldier has the right to question any order with which he or she disagrees, or that a soldier may delay compliance with an order pending such an explanation. The soldier who believes that an order is misguided or unwise may, if time and circumstances permit, bring this to the attention of superiors, while complying with the order. Appellant testified that he did not approach MG Meade because the IG ordered him not to do so. The IG denied giving any such directive. Using our fact-finding authority under Article 66, UCMJ, we find that the IG gave no such order in this case.

11. In this civil action before the Supreme Court, a marine challenged the legality of his court-martial. The marine refused to continue to per-

form duties on a deployment after his term of enlistment had expired and raised justification as a defense. The Supreme Court rejected the defense.

12. "This inference does not apply to a patently illegal order, such as one that directs the commission of a crime." Manual for Courts–Martial, United States (1995 edition), Part IV, para. 14c(2)(a)(i) [hereinafter MCM, 1995]. "But while a military inferior may be justified in not obeying an order as being unlawful, he will always assume to do so on his own personal responsibility and at his own risk." Winthrop at 576. "For it is essential to its security and efficiency that the authority and command confided to the [commanding] officer, when it has been exercised from proper motives, should be firmly supported in the courts of justice, as well as on shipboard [or in the field]." *Dinsman,* 53 U.S. at 403.

sonal safety of fellow servicemembers, would be endangered if individual soldiers were permitted to act upon their own interpretation of public Presidential statements without specific orders. The effectiveness of military operations, and the lives of a soldier's comrades, depend on precise and timely obedience to orders, especially in tactical environments. Appellant failed to report to his assigned duty position because he construed his commander's operational priorities as not fully executing the President's intent. A soldier has no such option.

An officer who engages in criminal conduct because he believes his ability to interpret the President's intent and to determine national policy and strategic objectives is superior to that of his civilian and military leadership is not entitled to a justification defense. The mere fact that appellant's advice was ignored does not legally justify his commission of these crimes.[13] We hold as a matter of law that appellant's personal interpretation of the President's command intent did not create a "legal duty" to inspect the National Penitentiary.

### International Law

■ Appellant also argues his actions were justified because he had a legal duty under international law to act. Appellant contends that the MNF, and hence the United States, became "an occupying power" under international law and thereby assumed control of, and legal responsibility for, the National Penitentiary. He argues that, notwithstanding the permissive nature of the entry of the MNF, the entry was secured under threat of invasion, and therefore duress, so that the rules of occupation should apply.

Whether the MNF and its constituent elements were occupying powers is, in large measure, a nonjusticiable political question. *See generally Gilligan v. Morgan,* 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973) (review of Ohio National Guard "Use of Force" rules was nonjusticiable); *Oetjen v. Central Leather Co.,* 246 U.S. 297, 301, 38 S.Ct. 309, 310, 62 L.Ed. 726 (1918) (conduct of foreign relations not subject to judicial review); *United States v. Palmer,* 16 U.S. (3 Wheat) 610, 4 L.Ed. 471 (1818) (whether warships of a foreign country engaged in a civil war committed piracy against U.S. vessels on the high seas was a political question). The legality of the employment of military forces is not reviewable by the judiciary. *Huet–Vaughn,* 43 M.J. at 115. *See also Atlee v. Richardson,* 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973) *aff'g* 347 F.Supp. 689 (D.C.E.D.Pa. 1972) (legality of war in Southeast Asia was political question). Similarly, the determination and recognition of the de facto or de jure government of another country is a political question. *Oetjen,* 246 U.S. at 301, 38 S.Ct. at 310 (citing *Jones v. United States,* 137 U.S. 202, 212, 11 S.Ct. 80, 83–84, 34 L.Ed. 691 (1890)).

On matters concerning military operations, courts should defer to the judgments and actions of the President and commanders in the field, at least in the absence of overwhelming facts to the contrary.[14] In this case, the Haitian military government remained in power, the division of responsibilities between it and the MNF was ambiguous, and the degree of control exercised by the MNF was far from absolute. Under these

---

**13.** Similarly, a servicemember's conscience, religious beliefs, moral judgment, or personal philosophy cannot justify or excuse the disobedience of an otherwise lawful order. MCM, 1995, Part IV, para. 14c(2)(a)(iii). *See United States v. Huet–Vaughn,* 43 M.J. 105, 114 (1995); *United States v. Wilson,* 19 U.S.C.M.A. 100, 41 C.M.R. 100, 1969 WL 6300 (1969); *United States v. Kabat,* 797 F.2d 580 (8th Cir.1986); *United States v. Moylan,* 417 F.2d 1002, 1009 (4th Cir. 1969). Appellant's personal and religious convictions concerning the protection of human rights may explain his conduct, but they do not legally justify it. Nothing in the record, other than appellant's own beliefs, indicates that MG Meade, or anyone else in appellant's chain of command, issued orders that were patently beyond their authority or that were clearly illegal.

**14.** When courts have decided whether "time of war" exists for various purposes, they have generally looked to both the fact of actual hostilities and the recognition of such a state, not necessarily through a declaration of war, by the executive and legislative branches. *Bas v. Tingy,* 4 U.S. (4 Dall.) 37, 1 L.Ed. 731 (1800). *See also United States v. Anderson,* 17 U.S.C.M.A. 588, 38 C.M.R. 386, 1968 WL 5425 (1968); *United States v. Ayers,* 4 U.S.C.M.A. 220, 15 C.M.R. 220, 1954 WL 2280 (1954).

circumstances, this record does not establish a sufficient factual basis to conclude that U.S. forces "occupied" the National Penitentiary.

Even assuming the MNF did constitute an "occupying power," such status imposed no individual legal duty upon appellant to act. Appellant claims that he had a personal legal duty, as a member of the U.S. forces, to prevent human rights violations because he was aware of information which strongly suggested that inhumane conditions existed at the National Penitentiary. Appellant's amorphous argument asserts he would be criminally liable under *In re Yamashita v. Styer,* 327 U.S. 1, 66 S.Ct. 340, 90 L.Ed. 499 (1946), a "Nuremberg defense,"[15] and international law generally,[16] if he failed to act.

Appellant's reliance on General Yamashita's case is misplaced. The legal issue in the prosecution of General Yamashita for war crimes after World War II was

> whether the law of war imposes on an army commander a duty to take such appropriate measures as are within his power to control the troops under his command for the prevention of the specified acts which are violations of the law of war and which are likely to attend the occupation of hostile territory by an uncontrolled soldiery, and whether he may be charged with personal responsibility for his failure to take such measures when violations result.

*Yamashita,* 327 U.S. at 14–15, 66 S.Ct. at 347–48. General Yamashita was convicted for failing to do his duty to prevent illegal acts that he knew, or should have known, were committed by persons under his command in violation of the law of war. Appellant had no command authority and no one

under his control was committing war crimes at the National Penitentiary.

Appellant's purported criminal liability under a "Nuremberg defense" for failing to act is similarly misguided. The Eleventh Circuit, U.S. Court of Appeals, previously rejected this same argument in a prosecution for pouring blood on nuclear missile launchers.

> Defendants here misperceive the persons for whom such a Nuremberg "defense" is appropriate. There the German defendants were in positions which required them to participate in sentencing dissidents to death or in utilizing slave labor because domestic law or superior authority ordered them to do so (citations omitted). The question is whether what they were required to do by domestic law could escape international criminal proscription. The War Crimes Tribunal ruled, however, that in certain circumstances those defendants were charged with a duty not to act in accordance with domestic law to avoid liability under international law. *Defendants in the case before us stand this doctrine on its head in arguing that a person charged with no duty or responsibility by domestic law may voluntarily violate a criminal law and claim that violation was required to avoid liability under international law. The domestic law simply did not require defendants to do anything that could even arguably be criminal under international law* (emphasis added).

*United States v. Montgomery,* 772 F.2d 733, 737–38 (11th Cir.1985). *See also Huet-Vaughn,* 43 M.J. at 114.

Appellant cites no case, and we can find none, where a servicemember was convicted of a war crime for failing to act under facts similar to this case.[17] Any duty appellant

---

**15.** *See generally Nuremberg and the Rule of Law: A Fifty-year Verdict (A Collection of Works Assessing the Legality of the War Crimes Trials of World War II),* 149 Mil.L.Rev. (1995).

**16.** Appellant cites a litany of human rights provisions from United Nations' resolutions and general provisions from Hague Convention No. IV Respecting the Law and Customs of War on Land, and the Geneva Convention Relative to the Protection of Civilian Persons in Time of War. However, none of these provisions created a legal duty under general principles of international

law which required appellant to inspect the National Penitentiary.

**17.** *Compare United States v. Goldman,* 44 C.M.R. 471, 1970 WL 7296 (A.C.M.R.1970), where a company commander in Vietnam was court-martialed for not reporting the rape and murder of a civilian female detainee by members of his company. Captain Goldman was convicted of violating a local regulation for failing to report a "non-battle death" of a female who died from gunshot wounds inflicted while she was in the custody of his unit. *Goldman,* 44 C.M.R. at 473.

may have had was discharged when he reported the prison conditions to his superiors. Their failure to act, even assuming they were required to do so and that their inaction was criminal, could hardly render appellant criminally liable. We hold as a matter of law that appellant had no personal legal duty to inspect the National Penitentiary to avoid criminal liability under international law.

In summary, appellant requested, and received, an accurate instruction on the defense of duress, properly tailored to the facts of his case. Appellant's evidence failed to meet the minimum threshold to entitle him to an additional instruction on the affirmative defense of justification. *Bailey,* 444 U.S. at 414–15, 100 S.Ct. at 636–37.[18] We also note that the submission of the defense evidence on justification to the members, though not required, may have strengthened appellant's duress defense.[19]

## UNLAWFUL COMMAND INFLUENCE AND CONFLICTS OF INTEREST

■ Appellant contends he was denied a fair trial "as a result of interrelated unlawful command influence and conflicts of interest" affecting the entire command including the convening authority, the court and panel members, and prosecution witnesses, but provides few specifics and less evidence.

Appellant presented no evidence of unlawful command influence, either at trial or on appeal. The military judge properly ruled, based upon the evidence presented by the government, that the convening authority had no personal involvement in the preferral of charges and no demonstrated personal interest in the outcome of the case. There is no evidence that MG Meade, or anyone else in a position of authority, attempted in any way to influence any member, any witness, or any other participant in the trial process. The defense had the burden of producing evidence to raise this issue. *United States v. Argo,* 46 M.J. 454, 457 (1997); *United States v. Drayton,* 45 M.J. 180 (1996); *United States v. Ayala,* 43 M.J. 296 (1995). Bare allegations and speculation will not suffice. *United States v. Allen,* 33 M.J. 209, 212 (C.M.A.1991). We hold that the defense failed to meet its initial burden of producing sufficient evidence to raise unlawful command influence.

Appellant's conflict of interest challenge contends that MG Meade, several prosecution witnesses, and all but one of the members were disqualified from participating in his case because they also served in Haiti. This contention implicitly has two parts. First, the convening authority and the members could not fairly judge appellant's actions without judging the legality and propriety of their own action or inaction. Second, the convening authority, the witnesses, and the

18. Appellant's mistake concerning his legal duties was likewise not a defense. Appellant's erroneous belief that he had a legal duty to inspect the prison was a mistake of law, not fact. He claimed a legal duty that did not exist. Mistake of law is not a defense for appellant's misconduct. R.C.M. 916(*l*)(1). Appellant has no mistake of fact defense.

19. Although not clearly articulated, appellant also claims that the military judge should have instructed on the common law defense of necessity: he committed these offenses in order to avoid a far greater harm that would have resulted had he complied with the law. Our court has previously held that the defense of necessity does not apply in military law. *United States v. Banks,* 37 M.J. 700, 702 (A.C.M.R.1993). *Accord United States v. Olinger,* 47 M.J. 545 (N.M.Ct.Crim.App. 1997). In *United States v. Rankins,* 34 M.J. 326 (C.M.A.1992), our superior court was divided over the question of whether the defense of necessity may apply in courts-martial. Appellant's case provides us no cause to reconsider our holding in *Banks.* Even if the defense of necessity did apply in courts-martial, it would be of no aid to appellant. One element of the necessity defense is that the "harm threatened must be imminent, leaving no alternative by which to avoid the greater harm." *Rankins,* 34 M.J. at 329. *See also Bailey,* 444 U.S. at 410, 100 S.Ct. at 634–35, "Under any definition of these offenses [necessity or duress] one principle remains constant: if there was a reasonable, legal alternative to violating the law, 'a chance both to refuse to do the criminal act and also to avoid the threatened harm,' the defenses will fail." In this case, appellant utterly failed to demonstrate that he had no reasonable alternative to committing his offenses. Under the circumstances, the military judge was not obliged to give a necessity instruction. Furthermore, given the trend toward merging the defenses of necessity and duress, noted in *Bailey,* 444 U.S. at 410, 100 S.Ct. at 634–35, even if a necessity instruction were called for, the tailored duress instruction given by the military judge adequately addressed this issue under the facts of this case.

members were biased against the appellant because he had, at least impliedly, accused them of dereliction of duty or worse.

■ Our conclusion that the defense of justification does not lie in this case, as a matter of law, substantially undercuts appellant's claim that his trial was tainted by conflicts of interest. Appellant failed to raise even a reasonable inference that MG Meade or any of the members or witnesses violated international law or superior orders. Appellant presented no evidence (as distinguished from speculation) that MG Meade had anything other than an official interest in this case. Similarly, appellant made no specific claim against any prosecution witness regarding conflicts of interest. Bias by a witness, if it exists, is properly the basis of cross-examination and impeachment, not disqualification. *See United States v. Hunter,* 21 M.J. 240, 242 (C.M.A.1986).

Appellant's assertion that he received an unfair trial because of inherent conflicts of interest is without merit. We address alleged conflicts of interest by the court members in the next section.

## CHALLENGES FOR CAUSE

Counsel for both parties and the military judge conducted extraordinarily extensive in-

dividual voir dire of each of the twelve detailed court-martial members. Voir dire lasted for two days and consumed over 500 pages of the record of trial. The military judge excused one member, sua sponte, during voir dire. The defense challenged each of the eleven remaining members for cause for numerous reasons including that an acquittal would damage the reputation of MG Meade, the members individually, and the 10th Mountain Division; that many of the members were familiar with several of the key witnesses against appellant and would give their testimony undue weight; that the members had been exposed to and affected by pretrial publicity in the case; and that most of the members evinced an inelastic attitude about a possible sentence in the case. More specific allegations were made against several members individually. The government opposed every challenge. The military judge granted five of the defense's eleven challenges for cause.[20]

After the government declined to exercise its peremptory challenge, the defense asked the military judge to reconsider his rulings on Colonel (COL) Dubik[21] and Major (MAJ) Arata.[22] The military judge adhered to his original rulings. Civilian defense counsel,

20. The military judge's reasons for granting these five challenges for cause included inelastic attitudes toward sentencing, lack of impartiality in evaluating LTC Bragg's testimony, and overall inability to evaluate the evidence as impartial members.

21. We carefully examined the statements of COL Dubik about a brief conversation he had with the division Chief of Staff concerning the investigation of appellant's offenses. Colonel Dubik stated that a few days after appellant's actions, the Chief of Staff told him that there was an ongoing investigation of an incident concerning a captain going to the prison. That was all the Chief of Staff said. Colonel Dubik did not speak to MG Meade about the incident, was not aware of MG Meade's thoughts about it, and did not know any details about what happened. We are satisfied that the military judge did not abuse his discretion in determining that COL Dubik could be a fair and impartial member.

22. Major Arata was challenged because of an incident he observed at the port facility on his first day in Haiti. During voir dire he explained what happened that day:

[T]he [Haitian] police were coming to the port facility, and they were trying to keep the Haitians—population away from the gates of the port facility so traffic could go in and out, and in one instance they were using pretty violent methods to keep the people away, an individual was trampled to death and there was a lot of brew-ha-ha (sic) about why we didn't do anything to stop that, and at the beginning our rules of engagement didn't allow us to do that, and within 2 days those rules of engagement changed to what was called a graduated response, where we were allowed to intervene in a graduated manner to stop Haitian–on–Haitian violence.

Major Arata further explained that he did not actually see the individual that was killed; that he wished he had understood the Haitian police crowd control methods sooner; that the incident was not something that weighed terribly on him; and that it would have no effect at all on his ability to judge appellant's case. The military judge found that the tenor of all of MAJ Arata's responses was, "I'd have to hear all extenuating circumstances." The judge found that MAJ Arata repeatedly indicated that he could follow instructions. The judge concluded, "I have no

after conferring with appellant, then peremptorily challenged LTC Buckley without explanation.[23]

### Actual Bias

■ We apply a clear abuse of discretion standard when reviewing a military judge's failure to grant a challenge for cause based upon a claim of actual bias. *United States v. Dinatale,* 44 M.J. 325, 327–28 (1996); *United States v. Hamilton,* 41 M.J. 22, 25 (C.M.A.1994); *United States v. McLaren,* 38 M.J. 112, 118 (C.M.A.1993); *United States v. White,* 36 M.J. 284, 287 (C.M.A.1993). Military judges enjoy great deference on actual bias challenges because they are in the best position to "observe the demeanor of court members and assess their credibility during voir dire." *United States v. Daulton,* 45 M.J. 212, 217 (1996). "There are few aspects of a jury trial where we would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse of discretion, than in ruling on challenges for cause." *United States v. Smart,* 21 M.J. 15, 19 (C.M.A.1985) (citations omitted). That principle is particularly true in this case where the military judge had the benefit of such lengthy and comprehensive voir dire examinations, excused one member sua sponte for cause, and granted five defense challenges for cause.

■ Court-martial members are not disqualified merely because they have professional relationships with other members or with witnesses. *Daulton,* 45 M.J. 212; *White,* 36 M.J. 284. Some knowledge of the facts of the case, or an unfavorable inclination toward an offense, is not per se disqualifying. *See United States v. Napoleon,* 46 M.J. 279, 283 (1997); *McLaren,* 38 M.J. at 118. What is critical is that the member be able to lay aside any outside knowledge, association, or inclination, and decide the case fairly and impartially on its merits. *See* R.C.M. 912; *Napoleon,* 46 M.J. 279; *United States v. Reynolds,* 23 M.J. 292 (C.M.A.1987).

■ We have carefully examined the arguments of counsel and the comprehensive voir dire including the extensive questioning of the members by the military judge who, unlike us, had the opportunity to observe and listen to each member's response. The military judge's rulings and detailed explanations persuade us that he did not abuse his discretion in denying the defense challenges for cause. The record fully supports the military judge's determination that each member could impartially decide the case on its facts in accordance with his instructions; would not give undue weight to the testimony of particular witnesses with whom he might be acquainted;[24] and would consider the entire range of permissible punishments.

### Implied Bias[25]

■ The question here is whether, as seen through the eyes of the public, a mem-

---

doubt that he can be an impartial court member." After carefully reviewing MAJ Arata's 65 pages of individual voir dire, we agree. The record simply does not substantiate that the incident at the port facility affected MAJ Arata's impartiality.

**23.** We find the numerous challenges for cause against LTC Buckley to be unsubstantiated. Further, we note that the defense failed to state that it would have exercised its peremptory challenge against another member if the challenge for cause against LTC Buckley had been granted. Therefore, under R.C.M. 912(f)(4) the defense has waived its challenge for cause against LTC Buckley. *See also United States v. Eby,* 44 M.J. 425, 426–27 (1996).

**24.** We particularly examined the statements of MAJ Groefsema concerning his association with LTC Bragg in a Bible study class. Major Groefsema stated that he and his wife were members of a weekly Bible study group with other couples, including LTC and Mrs. Bragg. Major Groefsema did not attend regularly. Major Groefsema estimated that he and LTC Bragg had attended the Bible study at the same time on approximately six occasions. Having carefully reviewed MAJ Groefsema's 47 pages of individual voir dire, we find no basis to find that the military judge abused his discretion in concluding that MAJ Groefsema was able to weigh LTC Bragg's testimony fairly.

**25.** There is some question to what extent implied bias is an appropriate basis for challenge. *See United States v. Lavender,* 46 M.J. 485 (1997) (suggesting that a successful challenge for implied bias is a "rare exception"). *See also Napoleon,* 46 M.J. at 285 (Crawford, J., concurring in part and in the result); *Dinatale,* 44 M.J. at 329 (Cox, C.J., concurring). However, the doctrine appears to remain alive. *Lavender,* 46 M.J. at 485; *Daulton,* 45 M.J. at 212.

ber should not sit "in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." R.C.M. 912(f)(1)(N); *United States v. Minyard,* 46 M.J. 229, 231–32 (1997); *Daulton,* 45 M.J. at 217; *United States v. Harris,* 13 M.J. 288, 292 (C.M.A.1982). Our standard of review, again, is abuse of discretion by the military judge, but "we give less deference to the military judge when implied bias is involved." *Minyard,* 46 M.J. at 231 (citations omitted).

The total absence of a justification defense removes much of appellant's implied bias argument. The members simply were not confronted with having to condemn appellant in order to justify their own conduct or defend their reputations. We are satisfied that members of the public, aware of all the facts and circumstances, would not conclude that this panel was biased or unfair. We specifically find no implied bias on the part of any member.

### Pretrial Publicity

█ Appellant also claims that his trial was tainted by prejudicial pretrial publicity. Such publicity can infect a trial in two ways. *United States v. Curtis,* 44 M.J. 106, 139 (1996). First, it can create presumed prejudice, when the publicity is prejudicial, pervasive, and inflammatory, and actually saturates the entire community. The publicity in this case fell far short of this threshold.[26] Second, it can create actual prejudice, by generating fixed opinions by the members that they cannot lay aside. We have already found that no such actual bias or prejudice existed here.

█ It is clear from the record that the defense actively and intentionally generated most of the pretrial publicity in this case. In addition, the defense argued strenuously and unsuccessfully against a government motion that the military judge order twenty potential members and alternates to avoid pretrial publicity. This court is not sympathetic to allegations of unfair pretrial publicity when the defense decides tactically to try its case in the media before the trial. *Accord Mont-*

*gomery,* 772 F.2d at 736. Each member who was aware of the pretrial publicity said that he would not be affected by anything he may have heard about the case previously. We find no adverse impact on the members' impartiality as a result of the pretrial publicity in this case.

### SUFFICIENCY OF THE EVIDENCE

Appellant argues that the evidence was insufficient to support the findings of guilty. Appellant also contends that the findings of not guilty of two related charges, and the convening authority's post-trial dismissal of a third, effectively impeach the remaining findings of guilty.

█ When reviewing a case for legal sufficiency, the scope of review is whether, viewing the evidence in a light most favorable to the prosecution, a reasonable fact finder could have found all the essential elements beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The test for factual sufficiency is whether, after weighing the evidence and making allowances for not having seen the witnesses in person, this court is convinced that the appellant is guilty beyond a reasonable doubt. *United States v. Turner,* 25 M.J. 324 (C.M.A.1987). We find that all of the approved findings are legally and factually sufficient.

We further find that the mixed findings in this case are not inconsistent and do not impeach the approved findings of guilty. We also note that, in general, inconsistent verdicts do not impeach findings of guilty. *United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984); *United States v. Watson,* 31 M.J. 49 (C.M.A.1990). The mixed findings of guilty in this case demonstrate that the court members fairly weighed the evidence against each specification and convicted appellant only of charges proven beyond a reasonable doubt.

### DECISION

We have carefully considered the remaining assignments of error and find them to be

---

26. The publicity in this case, including numerous newspaper articles in papers throughout the country, was mostly generated by appellant and

generally portrayed his actions in a favorable manner.

without merit. We are entirely satisfied that appellant received a fair and impartial trial. We also find that the approved sentence is appropriate. Accordingly, the findings of guilty and the sentence are affirmed.

Chief Judge COOKE and Senior Judge TOOMEY concur.