**UNITED STATES, Appellee,**

v.

**Specialist Michael G. NEW, United States Army, Appellant.**

**ARMY 9600263.**

U.S. Army Court of Criminal Appeals.

28 April 1999.

For Appellant: Henry L. Hamilton (argued); Captain Norman R. Zamboni, JA; Captain Paul Fiorino, JA (on brief); Henry L. Hamilton; Captain Paul Fiorino, JA (on reply brief); Colonel John T. Phelps II, JA.

For Appellee: Captain Arthur J. Coulter, JA (argued); Colonel Joseph E. Ross, JA; Lieutenant Colonel Frederic L. Borch III, JA; Captain Chris A. Wendelbo, JA; Captain John M. Bergen, JA (on brief); Colonel Joseph E. Ross, JA; Lieutenant Colonel Frederic L. Borch III, JA; Captain Chris A. Wendelbo, JA; Captain Arthur J. Coulter, JA (on supplemental brief).

Before TOOMEY, Senior Judge, ECKER and CARTER, Appellate Military Judges.

## OPINION OF THE COURT

TOOMEY, Senior Judge:

Contrary to his pleas, appellant was found guilty by a panel of officers and enlisted soldiers, sitting as a special court-martial empowered to adjudge a bad-conduct discharge, of failure to obey a lawful order in violation of Article 92, Uniform Code of Military Justice, 10 U.S.C. § 892 [hereinafter UCMJ]. The panel sentenced appellant to a bad-conduct discharge. The convening authority approved the adjudged sentence.

This case is before the court for review pursuant to Article 66, UCMJ. Appellant asserts nine assignments of error.[1] For the reasons discussed herein, we find no merit in any of appellant's assertions of error.

## FACTS

The United Nations [hereinafter UN] established a UN Protective Force [hereinafter UNPROFOR] in the Former Yugoslavian Republic of Macedonia [hereinafter FYROM] in 1992.[2] In 1993, the United States contrib-

---

1.
### Assignment of Error I
THE MILITARY JUDGE ABUSED HIS DISCRETION BY DENYING SPC NEW'S CAUSAL CHALLENGE AGAINST A MEMBER WHO ORDERED A SUBORDINATE TO WEAR THE UN UNIFORM AND DEPLOY TO MACEDONIA
### Assignment of Error II
THE EVIDENCE ADDUCED AT TRIAL WAS LEGALLY AND FACTUALLY INSUFFICIENT TO PROVE THAT SPC NEW FAILED TO OBEY A LAWFUL ORDER
### Assignment of Error III
BECAUSE THE EVIDENCE AFTER THE GOVERNMENT'S CASE IN CHIEF (sic) SHOWED THAT SPC NEW WAS PREVENTED FROM COMPLYING WITH THE ORDER, THE MILITARY JUDGE ABUSED HIS DISCRETION BY FAILING TO GRANT THE DEFENSE MOTION FOR A FINDING OF NOT GUILTY
### Assignment of Error IV
SPC NEW'S FIFTH AND SIXTH AMENDMENT RIGHTS TO DUE PROCESS AND A FAIR TRIAL WERE VIOLATED BECAUSE THE MILITARY JUDGE FAILED TO INSTRUCT THE MEMBERS ON THE DEFENSE OF INABILITY
### Assignment of Error V
SPC NEW'S FIFTH AND SIXTH AMENDMENT RIGHTS TO DUE PROCESS AND A FAIR TRIAL WERE VIOLATED BECAUSE THE MILITARY JUDGE FAILED TO INSTRUCT THE MEMBERS ON THE DEFENSE OF OBEDIENCE TO ORDERS

### Assignment of Error VI
SPC NEW'S FIFTH AND SIXTH AMENDMENT RIGHTS TO DUE PROCESS AND A FAIR TRIAL WERE VIOLATED BECAUSE THE MILITARY JUDGE INSTRUCTED THE MEMBERS ERRONEOUSLY ON THE DEFENSE OF MISTAKE
### Assignment of Error VII
SPC NEW'S FIFTH AND SIXTH AMENDMENT RIGHTS TO DUE PROCESS AND A FAIR TRIAL; HIS RIGHT TO A TRIAL BY MEMBERS; AND HIS RIGHT TO COMPULSORY PROCESS, CONFRONTATION OF WITNESSES, AND EFFECTIVE ASSISTANCE OF COUNSEL; WERE VIOLATED BECAUSE THE MILITARY JUDGE FAILED TO PERMIT MEMBERS TO HEAR EVIDENCE CONCERNING THE UNLAWFULNESS OF THE ORDER
### Assignment of Error VIII
THE MILITARY JUDGE ERRED BY FINDING THAT THE ORDER WAS LAWFUL
### Assignment of Error IX
AN APPROVED SENTENCE THAT INCLUDES A BAD CONDUCT (sic) DISCHARGE FOR SPC NEW'S OFFENSE IS INAPPROPRIATELY SEVERE

2. S.C. Res. 795, U.N. SCOR, 47th Sess., U.N. Doc. S/RES/795 (1992). The FYROM government requested this military force to observe, monitor, and report concerning activities along the FYROM border with Albania and the Federal Republic of Yugoslavia (Serbia and Montenegro).

uted troops to this protective force.[3] In 1995, this force was redesignated as the United Nations Preventive Deployment Force [hereinafter UNPREDEP].[4]

In August of 1995, the 1st Battalion, 15th Infantry Regiment, 3d Infantry Division [hereinafter 1/15 Infantry] received orders to assume the FYROM UNPREDEP mission effective 1 November 1995.[5] The 1/15 Infantry identified their mission needs, established a task organization, and began intense training for the mission. Because of the harsh winter weather conditions expected in the FYROM and dispersal of troops in small isolated outposts, the task organization augmented each squad with a medic. Appellant, a medic, was attached for the mission to a squad of Company A, 1/15 Infantry. Early in the train-up period, appellant expressed concern about deploying on the UN mission and wearing UN accouterments on his United States Army battle dress uniform [hereinafter BDU]. Appellant stated his belief that wearing UN accouterments on his United States Army BDUs represented an involuntary change of allegiance from the United States to the United Nations. Appellant's concerns were spread on the internet by appellant's father; were reported by the media, including the *Stars and Stripes* newspaper; and were publicly noted by several members of Congress and political candidates. Appellant's noncommissioned officer leadership, company commander, and battalion commander each spoke personally with appellant to alleviate his doubts concerning the lawfulness of both the United States Army participating in the UN FYROM mission and the prescribed uniform. Appellant's battalion commander, Lieutenant Colonel (LTC) Layfield, met personally with appellant three times to discuss appellant's concerns. Appellant did not tell anyone in his chain of command prior to trial that he believed that the prescribed uniform conflicted with Army Regulation [hereinafter AR] 670-1, Wear and Appearance of Army Uniforms and Insignia (1 Sept. 1992). Appellant continued to train with the unit throughout its preparation and validation period.

Prior to deployment, the unit was granted block leave.[6] Appellant visited Washington, D.C., met with retired Marine Reserve Colonel (COL) Robert Ray, who was to become one of his civilian defense counsel, and was introduced to several of the legislators who expressed concern with the legality of the FYROM UNPREDEP mission and President Clinton's representations concerning the mission. On 2 October 1995, after block leave, the unit received a briefing concerning the origins and legality of the FYROM UNPREDEP mission. The briefing was prepared and presented at LTC Layfield's request by an operational law attorney. The briefing did not specifically address the legality of the United States Army BDU modifications for the FYROM UNPREDEP mission.[7] Neither appellant nor any of the other soldiers asked any questions concerning the lawfulness of the FYROM UNPREDEP mission or modified BDUs during the briefing's question and answer period. At the conclusion of the legal briefing, LTC Layfield addressed the unit, gave a short "pep talk," and ordered them to begin wearing the FYROM UNPREDEP mission uniform effective 0900 hours, 10 October 1995, at a battalion formation, and continuing until the mission's end.[8]

---

3. S.C. Res. 842, U.N. SCOR, 48th Sess., U.N. Doc. S/RES/842 (1993). President Clinton advised Congress by letter of this action and continued to advise Congress every six months in accordance with the War Powers Resolution. Pub.L. No. 93-148 at 5, 87 Stat. 555 (1973) (codified at 50 U.S.C. §§ 1541-1548 (1994)).

4. S.C. Res. 983, U.N. SCOR, 50th Sess., U.N. Doc. S/RES/983 (1995).

5. The 1/15 Infantry's lead elements began deploying on 21 October 1995.

6. The entire unit was given leave to attend to personal business and concerns.

7. The uniform ordered consisted of the regularly issued United States Army BDUs with a United States flag sewn on one shoulder, a UN blue patch sewn on the other shoulder, and UN blue field cap. Other FYROM UNPREDEP mission uniform accouterments issued for the mission included a khaki brassard with a UN blue patch affixed to it, a UN blue scarf, a UN blue beret to be fitted with a UN metal badge to be issued in the FYROM, and a UN identification card which was also to be issued in the FYROM.

8. The mission was scheduled to be completed 11 April 1996.

At a company formation on 4 October 1995, appellant's company commander, Captain (CPT) Palmateer, reissued LTC Layfield's orders concerning the UN mission uniform and the 0900 hours, 10 October 1995, battalion formation. Captain Palmateer wanted to ensure that the company understood the uniform requirement and formation order and that any soldier who missed the 2 October 1995 briefing was aware of the order. Captain Palmateer also ordered a company formation in the FYROM UNPREDEP mission uniform immediately preceding the 0900 hours, 10 October 1995, battalion formation, in order for the company to assume its position thereafter in the battalion formation. Once again, appellant was present at the time CPT Palmateer issued this order and asked no questions and expressed no concerns regarding either the lawfulness of the unit's mission to deploy as the FYROM UNPREDEP force or the mission's uniform modifications. The soldiers were subsequently issued the required UNPREDEP mission uniform items for their uniforms. Appellant turned in the required two sets of BDUs to be tailored to include the required American flag and blue UN shoulder patches.

As ordered by CPT Palmateer, appellant's company assembled in formation at 0845 hours, 10 October 1995, in preparation for the 0900 hours battalion formation. Appellant reported to the company formation in United States Army BDUs without the ordered FYROM UNPREDEP mission uniform modifications. As a result, appellant was removed from the company formation at about 0845 hours. The remainder of the company then assumed its place in the 0900 hours battalion formation. At approximately 1000 hours, 10 October 1995, LTC Layfield offered appellant a "second chance" to comply with the then effective standing FYROM UNPREDEP uniform order. Appellant persisted in his refusal to comply with the orders to wear the United States Army BDUs

with the prescribed FYROM UNPREDEP mission uniform modifications. Appellant was declared non-deployable and the unit began deploying to the FYROM without him on 21 October 1995.

Appellant's first trial session was held on 24 October 1995. Appellant was tried, without objection, on a duplicitous specification of failure to obey an "other" lawful order (Article 92(2), UCMJ).[9] Appellant did not request a bill of particulars.[10]

Appellant made numerous pretrial motions challenging the legality of the FYROM UNPREDEP mission and its uniform. The military judge ruled that these were interlocutory matters and determined that both the FYROM UNPREDEP mission and the mission uniform modifications were legal. Accordingly, appellant was precluded at trial from presenting evidence to the court-martial panel challenging President Clinton's legal characterization and justification of the mission and the legality of the orders modifying the United States Army BDUs to include the United States flag and UN insignia shoulder patches, UN headgear, and other accouterments as appropriate. Appellant's defense was thereby limited to asserting affirmative defenses of mistake, inability, and obedience to higher orders.

In his trial testimony on the merits appellant admitted that: he had knowledge of the charged orders; he knew his commanders had authority to give orders; he did not want to wear the "UN" uniform; he thought that wearing the UN insignia and beret constituted a shift of allegiance from the United States to the United Nations; he thought that "some colonel" over his battalion commander came up with the uniform idea; he believed that his commanders' orders conflicted with the provisions of the Army uniform regulation, AR 670–1, but that his belief was based upon a "skimming" of AR 670–1; he never sought a clarification from

---

9. Specification:
 In that Specialist Michael G. New, U.S. Army, having knowledge of a lawful order issued by LTC Stephen R. Layfield on 2 OCT 95 and CPT Roger H. Palmateer on 4 OCT 95, to wear the prescribed uniform for the deployment to Macedonia, i.e., U.N. patches and cap, an order

which it was his duty to obey, did, at or near Schweinfurt, Germany, on or about 10 OCT 95, fail to obey the same.

10. *See* Rule for Courts–Martial 906(b)(5) and (6) [hereinafter R.C.M.].

his superiors of the conflicts he believed existed between their orders and AR 670–1; he reported for the 10 October 1995 formations without the ordered FYROM UNPREDEP uniform modifications; and he declined LTC Layfield's 1000 hours, 10 October 1995, "second chance" to comply with the orders, stating that he intended to remain in his unmodified BDUs for the remainder of that day "unless they could show [him] some legal authority for [the modifications]."

Additional facts necessary for the resolution of individually assigned errors are set forth in the discussion of those errors.

## LAWFULNESS OF ORDERS TO MODIFY U.S. ARMY BATTLE DRESS UNIFORM TO INCLUDE UNITED NATIONS ACCOUTERMENTS (AE VII AND VIII)

### Facts

Appellant asserts that the military judge violated appellant's Fifth and Sixth Amendment Constitutional rights by determining the lawfulness of the violated orders as an interlocutory matter. Appellant contends that the military judge's action improperly denied appellant the opportunity to present evidence concerning the orders' lawfulness and to have the court-martial panel decide the question. Appellant further asserts that the military judge erred in finding the orders lawful. We disagree.

The issue of the orders' lawfulness was extensively litigated at trial. Appellant's arguments at trial and on appeal are substantially the same. The military judge considered appellant's evidence and arguments concerning this matter primarily in the context of appellant's motions to dismiss the charges against him because of the orders' "unlawful" nature. The crux of appellant's argument was that President Clinton misled Congress concerning the legal basis of the FYROM UNPREDEP mission and that the mission was illegal as undertaken.[11] Additional evidence was presented concerning uniform modifications permissible under the provisions of AR 670–1, prohibitions on accepting gifts and titles from foreign governments and wearing unauthorized insignia and decorations,[12] and the FYROM UNPREDEP command and control structure.

In support of his motions, appellant presented legal briefs; the testimony of Mr. David Sullivan (treated as an expert in international law); and copies of numerous UN Security Council Resolutions and Secretary–General reports addressing the UN's actions in the former Yugoslavia (Croatia, Bosnia–Herznogovina [hereinafter Bosnia], the Federal Republic of Yugoslavia (Serbia and Montenegro), and the FYROM).

Mr. Sullivan reviewed the relevant Security Counsel resolutions concerning the FYROM UNPREDEP, and concluded that UN Charter, Chapter VII, was the mission's legal basis because the first referenced document in the chain, S.C. Res. 713 (1991), dealing with the UN's initial actions in "Yugoslavia," cited UN Charter, Chapter VII, as its basis.[13] Appellant argued that the nature of the operation and this derivative reference supported the conclusion that the FYROM UNPREDEP mission was likewise a UN Charter, Chapter VII, operation. While numerous subsequent UN resolutions dealing with Bosnia specifically cited Chapter VII as the basis of those actions, the FYROM resolutions, in general, do not cite any UN Charter chapter as their basis.

---

11. Specifically, appellant asserted that the President misrepresented the FYROM UNPREDEP mission as a UN Charter, Chapter VI, and United Nations Participation Act, Section 7 (22 U.S.C. § 287d (1994)) [hereinafter UNPA], action in order to avoid obtaining prior congressional approval for the mission. Appellant asserted that the FYROM UNPREDEP was actually a United Nations Charter, Chapter VII, action requiring congressional approval pursuant to UNPA, Section 6, prior to the undertaking. No congressional approval was sought nor given.

12. United States Constitution, Article I, Section 9; 5 U.S.C. § 7342(a)(4) (1994); 32 C.F.R. 578.19a; *Manual for Courts–Martial, United States* (1995 ed.), Part IV, para. 113 (UCMJ art. 134, Wearing unauthorized insignia) [hereinafter *MCM* ]; AR 670–1, para. 3–4k.

13. S.C. Res. 713, U.N. SCOR, 47th Sess., U.N. Doc. S/RES/713 (1991) established an arms embargo against "Yugoslavia." Many of the other cited resolutions dealt with the UNPROFOR in Bosnia.

Appellant's expert attributed the absence of such references in the FYROM resolutions to political considerations necessary for the establishment and maintenance of a UN coalition by the United States and its allies. He submitted that because the Bosnia UN-PROFOR was a Chapter VII operation, the FYROM UNPREDEP was also a Chapter VII operation despite its separate creation and evolution.

The government cross-examined Mr. Sullivan concerning the differences between the Bosnia UNPROFOR and the FYROM UN-PREDEP and submitted briefs on the matter, but called no witnesses. The government asserted primarily that the questions of the President's representations and the United States' participation in the FYROM UN-PREDEP were nonjusticiable political questions.

In denying appellant's motions to dismiss, the military judge fairly summarized appellant's challenges to the orders' lawfulness as follows:

[O]ne, the order was unlawful, and that it was issued pursuant to an unlawful deployment of the [appellant]; two, the order was unlawful as it required the unauthorized alteration of the [appellant's] United States Army uniform; three, the order was unlawful as its effect was to subject the [appellant] to involuntary servitude as a U.N. soldier and, in effect, placing him in involuntary servitude in violation of the 13th Amendment of the United States Constitution; and fourth, the order was unlawful in that it was issued in breach of the [appellant's] enlistment contract.

After considering trial and defense counsel's arguments on the motion, the military judge determined that the lawfulness of an order was a question of law and therefore an interlocutory matter for the judge's determination. Upon further consideration of the evidence provided, the military judge determined that the orders were lawful.

The military judge made the following findings of fact concerning the FYROM UN-PREDEP mission:

- The President believed the deployment to be a matter important to United States foreign policy and national security interests.
- "[T]he President felt his actions ... [were] consistent with United Nations Security Council resolutions evidencing multinational consensus for action in the region, and that his action was in accordance with Section 7 of the United Nations Participation Act ...."
- The President ordered the deployment in accordance with his Constitutional authority as Commander–in–Chief and Chief Executive.
- Throughout the series of deployments the President informed Congress consistent with Section 4 of the War Powers Resolution.
- Implementing the President's orders, appellant's unit, the 1/15 Infantry, was selected and ordered to perform the FYROM UNPREDEP mission.
- Appellant's commanders issued orders for members of the command to modify their United States Army BDUs to include specific distinctive accouterments for the duration of the FYROM UNPREDEP mission. Modifications included distinctive UN blue headgear, a UN blue cloth patch sewn on the uniform's right shoulder, and the addition of a cloth United States flag on the uniform's left shoulder.
- The commander in charge of a maneuver may prescribe the uniform to be worn in a maneuver area. Applicable regulations enable commanders to prescribe uniform modifications considered necessary in the interest of safety so long as the items are furnished at no cost to the individual soldier. The FYROM UNPREDEP uniform alterations were lawful and in accordance with AR 670–1 because the modified uniform's easily recognizable and identifiable features "[have] a practical combat function which may enhance both the safety and/or tactical effectiveness of combat-equipped soldiers performing [UNPREDEP] tactical operations."
- The President and United States military commanders maintained command authority over United States forces in FYROM regardless of operational control by non-United States commanders.

● The United States military chain-of-command remained inviolate.

● The President determined that the deployment was pursuant to Chapter VI of the UN Charter and complied with troop limitations for Chapter VI, UN Charter, deployments established by Section 7 of the United Nations Participation Act.

● The FYROM UNPREDEP mission uniform accouterments were not gifts from foreign governments in violation of any statutory or regulatory prohibitions and complied with Section 7 of the United Nations Participation Act, providing: "Personnel involved in non-combatant assistance to the United Nations may accept directly from the United Nations any or all of the allowances or perquisites to which they are entitled, and extraordinary expenses and perquisites incident to such detail."

Concerning appellant's argument that because the FYROM UNPREDEP mission was illegal, the order to alter the Army uniform must also be illegal, the military judge found:

● "The order issued by [appellant's] commanders on 2 and 4 October 1995 was not an order to deploy, but merely an order made in preparation for the anticipated deployment of 1/15th Infantry to Macedonia. Accordingly, any violation of that order by [appellant] on 10 October 1995 was not, in fact, a violation of an order to deploy. It did not effectively call into issue the underlying legality of the deployment."

● An order to wear the prescribed FYROM UNPREDEP mission uniform "is not an order which has the meaning and/or effect to deploy to Macedonia or anywhere else."

● The emphasis in the military is upon obedience to orders. One disobeys an order at one's own peril. The law affords protection to those who obey all but the most patently illegal orders, i.e., orders the accused knows to be unlawful, or a person of ordinary sense and understanding would have known the orders to be unlawful.

● Appellant's commanders' orders to wear a United States Army uniform including distinctive accouterments associat-ed with the United Nations do not violate the United States Constitution, federal statute, contractual provision relating to service as a soldier in the United States armed forces, or amount to involuntary servitude, as defined by the 13th Amendment to the United States Constitution.

The military judge agreed with the government that the FYROM UNPREDEP deployment was an executive action and therefore a nonjusticiable political question, finding, under the doctrine of justiciability, that issues of the utilization and funding of the armed forces are beyond the consideration of military trial courts. *United States v. Huet–Vaughn,* 43 M.J. 105, 115 (1995).

### Discussion

#### a. Lawfulness of the Orders as a Matter for Judicial Determination

■ The military judge did not err by determining the lawfulness of the orders as an interlocutory question of law and by not submitting the question to the court-martial panel.

■ The military judge is the presiding officer in a court-martial and rules on all interlocutory questions and questions of law raised during a court-martial. UCMJ art. 51(b); R.C.M. 801(a) and (a)(4). When disobedience of an order is charged, the legality of the order is normally a question of law to be determined by the military judge as an interlocutory matter. UCMJ art. 51(b); R.C.M. 801(e)(1) and (5) discussion; *United States v. Carson,* 15 U.S.C.M.A. 407, 35 C.M.R. 379, 381, 1965 WL 4684 (1965); *United States v. Calley,* 46 C.M.R. 1131, 1183, 1973 WL 14570 (A.C.M.R.), *aff'd,* 22 U.S.C.M.A. 534, 48 C.M.R. 19, 1973 WL 14894 (1973); *United States v. Hawkins,* 30 M.J. 682, 684 (A.F.C.M.R.1990).

"A question is interlocutory unless the ruling on it would finally decide whether the accused is guilty." R.C.M. 801(e)(5) discussion. The military judge's determination of the orders' lawfulness did not finally decide the issue of appellant's guilt. The government was required to prove that the orders were issued by officers empowered to give such orders, that appellant had knowledge of

the orders, that appellant had a duty to obey the orders, and that appellant failed to obey the orders. *See MCM*, Part IV, para. 16b(2).

### b. Correctness of the Military Judge's Finding that the Orders Were Lawful

██ Whether the military judge correctly determined that the orders were lawful is a question of law to be reviewed *de novo*. *United States v. Padgett*, 48 M.J. 273, 277 (1998) (citing 2 S. Childress and M. Davis, *Federal Standards of Review* § 7.05 (2d ed.1992)); *United States v. Ayala*, 43 M.J. 296, 298 (1995). We hold that the military judge did not err in determining the orders to be lawful.

#### 1) Presumption of Orders' Lawfulness

██ An order is presumed to be lawful. W. Winthrop, *Military Law and Precedents* 297 (2d ed. 1920 Reprint) [hereinafter Winthrop]. A soldier disobeys an order "on his own personal responsibility and at his own risk." *See* Winthrop, at 576; *MCM*, Part IV, para. 14c(2)(a)(i). Appellant contested the orders' legality both at trial and on appeal. Appellant bears the heavy burden of showing that the orders were illegal. *United States v. Smith*, 21 U.S.C.M.A. 231, 45 C.M.R. 5, 8, 1972 WL 14107 (1972).

As this court observed and reemphasized in *United States v. Rockwood*, 48 M.J. 501 (Army Ct.Crim.App.1998):

An individual soldier is not free to ignore the lawful orders or duties assigned by his immediate superiors.

For there would be an end of all discipline if the seamen and marines on board a ship of war [or soldiers deployed in the field], on a distant service, were permitted to act upon their own opinion of their rights [or their opinion of the President's and United Nations' intent], and to throw off the authority of the commander *whenever they supposed it to be unlawfully exercised.*

*Rockwood*, 48 M.J. at 506 (quoting *Dinsman v. Wilkes*, 53 U.S. (12 How.) 390, 403, 13 L.Ed. 1036 (Dec. Term, 1851)) (emphasis added) (footnote omitted).

██ Unless the order requires an obviously illegal act, or is obviously beyond the issuer's authority, the servicemember will obey the order:

Where the order is apparently regular and *lawful on its face,* he is not to go behind it to satisfy himself that his superior has proceeded with authority, but is to obey it according to its terms, *the only exceptions recognized to the rule of obedience being cases of orders so manifestly beyond the legal power or discretion of the commander as to admit of no rational doubt of their unlawfulness.*

*Rockwood*, 48 M.J. at 506 (quoting *United States v. Calley*, 22 U.S.C.M.A. 534, 543, 48 C.M.R. 19, 28, 1973 WL 14894 (1973) (quoting Winthrop, at 296–297)). "The success of any combat, peacekeeping, or humanitarian mission, as well as the personal safety of fellow servicemembers, would be endangered if individual soldiers were permitted to act upon their own interpretation" of constitutional, presidential, congressional or military authority, and orders issued pursuant to such authority. *Rockwood*, 48 M.J. at 506–507.

Moreover, as stated in *McCall v. McDowell*, 1 Abb.U.S. 212, 15 F.Cas. 1235 (C.C.D.Cal.1867):

The first duty of a soldier is obedience, and without this there can be neither discipline nor efficiency in an army. If every subordinate officer and soldier were at liberty to question the legality of the orders of the commander, and obey them or not as they may consider them valid or invalid, the camp would be turned into a debating school, where the precious moment for action would be wasted in wordy conflicts between the advocates of conflicting opinions.

#### 2) Political Questions and Nonjusticiability

██ The military judge correctly determined that the question of the lawfulness of the FYROM UNPREDEP mission was a nonjusticiable political question. This court will respect both the President's powers as well as the powers of the nation's elected representatives in Congress. *Ange v. Bush*, 752 F.Supp. 509 (D.D.C.1990). *See also Bak-*

er v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Huet–Vaughn*, 43 M.J. at 115; *Rockwood*, 48 M.J. at 507.

### c. Lawfulness of Commander's Modification of Army Battle Dress Uniform

 Army Regulation 670–1, paras. 1–18 and 2–6d, allow commanders in maneuver areas to order necessary mission uniform modifications and allow uniform modifications necessary for safety reasons. The military judge found that the distinctive uniforms and easily recognizable identifiers which appellant's commanders ordered for the FYROM UNPREDEP mission had the practical combat function of enhancing the unit's tactical effectiveness and safety while performing the FYROM UNPREDEP mission and therefore were permissible changes envisioned by the regulation. We agree with the military judge's findings in this matter.

### d. Conclusion

Considering the long established historic and legal precedent that orders are presumed to be legal, the evidence of record supporting the legality of the charged orders, the military judge's detailed and specific findings, which we adopt as our own, and the political, nonjusticiable nature of the underly-

14. R.C.M. 916(j); Dep't of the Army, Pam. 27–9, Legal Services: Military Judges' Benchbook (1 May 1982), para. 5–11, Ignorance or Mistake of Law (C1, 15 Feb. 1985), and para. 5–8, Obedience to Orders [hereinafter Benchbook].

15. The military judge gave the following instruction:

> Now, members of the court, the evidence has raised the issue of mistake on the part of the accused concerning a duty to obey the order because it was unlawful. The accused contends that, on 10 October 1995, he believed the order to wear the prescribed uniform for the deployment to Macedonia, i.e., U.N. patches and cap, was unlawful. Specifically, the accused's contention *is, he believed that, by obeying the order, he would be required to violate AR 670–1, Wear and Appearance of Army Uniforms and Insignia.* I have judicially noticed that AR 670–1 is a lawful regulation that the accused had a duty to obey that regulation.
> The government contends, first, that this is not the reason the accused failed to obey the charged order; and, second, if it is the reason for the disobedience, it is unreasonable.

ing FYROM UNPREDEP mission, we find that the military judge was correct in determining that the question of the orders' lawfulness was an interlocutory question for the military judge's determination and that as a matter of law, the orders were lawful. There was no error.

## ALLEGED INSTRUCTIONAL ERRORS (AE V, VI, and IV)

Appellant asserts that the military judge erred in his instructions to the court-martial panel on findings by: 1) failing to separately instruct the court-martial members on the affirmative defense of obedience to orders; 2) erroneously instructing the court-martial members on the defense of mistake; and 3) failing to *sua sponte* instruct the court-martial members on the affirmative defense of inability. We find appellant's assertions to be without merit.

### Facts

The military judge and appellant's trial defense counsel engaged in lengthy discussions concerning the findings instructions. Appellant's counsel requested separate defense of mistake and obedience to orders defense instructions.[14] The military judge tailored a single instruction that combined the concepts of a mistake defense and an obedience to orders defense.[15]

> *If the accused mistakenly believed, by obeying the order, he would be required to violate AR 670–1, he is not guilty of the offense if his belief was reasonable.* To be reasonable, the belief must have been based on information, or lack of it, which would indicate to a reasonable person that, by obeying the order, he would be required to violate AR 670–1. In deciding this issue, you should consider the inherent probability or improbability of the evidence on this matter. You should consider, along with all the evidence in this case, the following: *I previously instructed you that, as a matter of law, the order in this case, as described in the specification—if, in fact, there was such an order—was a lawful order. I further instruct you at this time that, as a matter of law, the accused would not have violated AR 670–1 by obeying the order in this case as described in the specification, if, in fact, there was such an order.*
> Members of the court, *the accused did not have the benefit of the Court's rulings on the lawfulness of the order on 10 October 1995, the date of the charged order violation.*
> *All persons in the military service are required to strictly obey and properly execute the legal*

### Law

Rule for Courts–Martial 920 states the military judge's duties regarding instructions on findings.

(a) *In general.* The military judge shall give the members appropriate instructions on findings.

### Discussion

Instructions consist of a statement of the issues in the case and an explanation of the legal standards and procedural requirements by which the members will determine findings. *Instructions should be tailored to fit the circumstances of the case, and should fairly and adequately cover the issues presented.*

(Emphasis added.)

 As provided for by R.C.M. 920(e)(7)'s Discussion, it is appropriate for the military judge's instructions to summarize and comment upon the evidence. However, such summarization and commentary must be accurate, fair, dispassionate, and accomplished without partiality. Our standard of review for the overall sufficiency of instructions is *de novo.* *United States v. Maxwell,* 45 M.J. 406, 424 (1996) (citing *United States v. Snow,* 82 F.3d 935, 938–39 (10th Cir.1996)).

### Denial of Requested Obedience to Orders Instruction (AE V)

### Facts

At trial, appellant asserted that the obedience to orders defense arose in two respects: 1) appellant believed that the FYROM UN-

*orders of their lawful superiors. An order or regulation requiring the performance of a military duty or act may be inferred to be lawful, and it is disobeyed at the peril of the subordinate. While the unlawfulness of an order or regulation is a defense to the charge of disobedience, the inherent emphasis in the military upon obedience, except in the cases where the order is patently illegal encourages compliance with orders irrespective of legality. Immunity based on faithful obedience exists except where the accused knew the orders or regulations to be unlawful, or a person of ordinary sense and understanding would have known the orders or regulations to be unlawful. Additionally, the mistake cannot be based on a negligent failure to discover the true facts.*

PREDEP mission uniform order contradicted, and was subordinate to, AR 670–1, and 2) appellant obeyed CPT Palmateer's order to leave the 10 October 1995 company formation and was thereby precluded from attending the 0900 hours, 10 October 1995, battalion formation.

In discussing the affirmative defense of mistake instruction with the military judge, appellant's civilian defense counsel noted, "Right. We believe it also raises an obedience to orders defense .... And *I recognize that they dovetail a bit, but lawfulness dovetails into it, too...*" (emphasis added). The military judge responded:

> [I]t takes very little evidence to raise a special defense such as this, but I don't believe we have even that little evidence to raise this particular defense, so I will not give the instruction. I will incorporate, though, your theory and [appellant's] testimony with respect to the uniform regulation in the mistake of law instruction.

### Law

 "The defense is not entitled to a requested instruction unless it is correct, necessary and critical." *United States v. Eby,* 44 M.J. 425, 428 (1996). "The military judge is not required to give the instruction requested by counsel ... as long as the issue is adequately covered in the instructions." R.C.M. 920(c) discussion.

 As stated in *United States v. Damatta–Olivera,* 37 M.J. 474, 478 (C.M.A. 1993):

> The burden is on the prosecution to establish the accused's guilt. *If you are convinced beyond a reasonable doubt that, at the time of the charged offense, the accused was not under the mistaken belief that, by obeying the order, he would be required to violate AR 670–1, the defense of mistake does not exist. Even if you conclude that the accused was under the mistaken belief that, by obeying the order, he would be required to violate AR 670–1, if you are convinced beyond reasonable doubt that, at the time of the charged offense, the accused's mistake was unreasonable, the defense of mistake does not exist.*

(Emphasis added.)

While counsel may request specific instructions from the military judge, the judge has substantial discretionary power in deciding on the instructions to give. *United States v. Smith,* 34 MJ 200 (CMA 1992); RCM 920(c), Discussion. *The test to determine if denial of a requested instruction constitutes error is whether (1) the charge is correct; (2) 'it is not substantially covered in the main charge'; and (3) 'it is on such a vital point in the case that the failure to give it deprived defendant of a defense or seriously impaired its effective presentation.'* *United States v. Winborn,* 14 USCMA 277, 282, 34 CMR 57, 62, 1963 WL 4756 (1963).

(Emphasis added.)

 The military judge's determination not to give the requested instruction is reviewed for an abuse of discretion. *Damatta–Olivera,* 37 M.J. at 478. A military judge does not abuse his discretion unless the action is "arbitrary," "fanciful," "clearly unreasonable," or "clearly erroneous." *United States v. Mosley,* 42 M.J. 300, 303 (1995); *United States v. Travers,* 25 M.J. 61, 62 (C.M.A.1987). A mere difference in opinion does not constitute an abuse of discretion. *Mosley,* 42 M.J. at 303.

Rule for Court Martial 916(d) and its Discussion set forth the defense of obedience to orders: "It is a defense to any offense that the accused was acting pursuant to orders unless the accused knew the orders to be unlawful or a person of ordinary sense and understanding would have known the orders to be unlawful."

### Discussion

#### a. Compliance with AR 670–1

 The military judge correctly determined that the charged order was legal (*see* Assignments of Error VII and VIII, above). Appellant's commanders' orders did not contradict superior orders. *See United States v. Young,* 1 M.J. 433, 437 (C.M.A.1976). Appellant's testimony established that appellant: 1) read AR 670–1 in only a cursory manner; 2) found and relied upon only provisions of that regulation which he believed supported his position; 3) had the opportunity to seek clarification of the orders but did not seek assistance or guidance from any superior noncommissioned officer or officer to interpret the regulation; and 4) proceeded to violate his commanders' orders based upon his cursory reading and incorrect interpretation of the regulation. The military judge correctly determined that appellant's theory did not reasonably raise a defense of obedience to orders.

#### b. Compliance with CPT Palmateer's Order to Leave the Formation

 Appellant's compliance with CPT Palmateer's order to leave the company formation does not establish an obedience to orders defense for his failure to comply with the order regarding the 0900 hours battalion formation. Appellant knew when he reported out of uniform to the company formation that the company formation was an integral part of the battalion formation and that, after entering the company formation, he would not have the opportunity to don the appropriate uniform for the 0900 hours battalion formation. Indeed, appellant testified that he had no intent to wear the ordered uniform. Moreover, a refusal by word and/or deed under circumstances evincing an intentional defiance of authority of an order " 'not capable of being fully and immediately executed, but *requiring certain preparatory steps, which preparatory steps are intended to be, and are capable of being, commenced immediately,* and continued without material interruption until full execution ha[s] been accomplished,' " constitutes the offense of disobedience. *United States v. Patten,* 43 C.M.R. 820, 823, 1971 WL 12896 (A.C.M.R.1971) (emphasis added) (quoting *United States v. Turpin,* 35 C.M.R. 539, 541, 1964 WL 4963 (A.B.R.1964)); *cf. MCM,* Part IV, para. 14c(2)(g). Appellant refused to take the necessary preparatory steps to comply with the orders. The disobedience offense was already complete for both LTC Layfield's and CPT Palmateer's orders when appellant was ordered from the company formation. *Patten,* 43 C.M.R. at 823. The military judge correctly determined that appellant's theory did not reasonably raise a defense of obedience to orders.

The obedience to orders defense is a shield for those who obey orders; not a sword for those who would disobey orders. As this court said in *United States v. Lusk*, 21 M.J. 695 (A.C.M.R.1985):

> In combat, where the very existence of the nation is at stake, obedience to orders is vital. Sometimes commanders must order soldiers to lay down their very lives.... [T]hose soldiers must be relied upon to obey. In peacetime, soldiers must be trained in the same climate of obedience. The discipline which enables armies to prevail cannot be switched on and off like a lightbulb. The soldier must be conditioned to err on the side of obedience. Consequently, a soldier who disobeys an order because he believes that the order is illegal may nevertheless be punished if the order is in fact a lawful one.

*Lusk*, 21 M.J. at 700 (footnote omitted).

Appellant's tortured claim of an obedience to superior orders defense simply does not fit within the context of R.C.M. 916(d) or other legal precedents. Accordingly, we find that the military judge did not abuse his discretion by denying the requested instruction. *Eby*, 44 M.J. at 428. Regardless, appellant received the benefit of his claim by the military judge's inclusion of the concept of obedience to orders in the affirmative defense of mistake instruction.

Assuming arguendo that such a defense was raised, while a separate obedience to orders instruction was not given, the instruction that was given was correct, incorporated the substance of the obedience to orders instruction in the affirmative defense of mistake instruction, and did not deprive the appellant of a defense or improperly impair the presentation of the defense case. *See Damatta–Olivera*, 37 M.J. at 478. In the total context of the instructions the requested matter was reasonably covered. *See United States v. Bradley*, 28 M.J. 197, 202 (C.M.A.1989). The military judge's instruction correctly stated the law concerning obedience to orders. It was not inappropriate for the military judge to relate the legal concept of obedience to the circumstances of the disobedience and to the evidence *in toto*

including the military judge's interlocutory determinations.

### Affirmative Defense of Mistake Instruction (AE VI)

#### Facts

Because appellant presented a defense that might be interpreted to raise a mistake of law, a mistake of fact, or a mixed mistake defense, the military judge crafted an affirmative defense of mistake instruction, as quoted above, from the Benchbook's general intent mistake of fact instruction.[16] The military judge concluded that a tailored instruction: 1) was necessary; 2) fairly included the matters appellant requested concerning the affirmative defenses of obedience to orders and mistake; 3) correctly stated the law; and 4) was framed in a manner to place the reasonableness of appellant's actions into context with the evidence and law. We agree.

Appellant alleged the following specific deficiencies both at trial and on appeal:

- The instructions "unduly emphasized the necessity to obey orders and had nothing to do with the special defense of mistake."

- The instructions discussed the extraneous concept of obedience to orders as a defense, i.e., immunity following from such obedience.

- The instructions advised the court-martial panel that "as a matter of law [appellant] would not have violated AR 670–1 by obeying the order in this case" and "as a 'matter of law' AR 670–1 would not have been violated if [appellant] wore the [FYROM UNPREDEP] uniform."

- "The instructions gratuitously re-emphasized the military judge's decision that [the] order was lawful" while emphasizing that the military judge determined that the charged order did not conflict with the uniform regulation, AR 670–1.

- The instructions portrayed appellant's "mistake defense as absurd and unbelievable."

---

16. Benchbook, para. 5–11, Ignorance or Mistake of Law (C1, 15 Feb. 1985).

- The instructions provided the wrong *mens rea* standard; honest and reasonable versus merely honest.

The orders appellant was charged with disobeying were issued by his superior officers, LTC Layfield and CPT Palmateer. While such disobedience could have been charged under Article 90, UCMJ, as a specific intent *willful disobedience* of a *superior commissioned officer* offense, the disobedience in the instant case was charged under Article 92(2), UCMJ, as a general intent failure to obey an *"other"* lawful order offense. However, appellant argued at trial and on appeal that Article 92(2), UCMJ, has a "knowledge" element and therefore should be treated as a specific intent or special state of mind offense. We disagree.

### Discussion

Examining the military judge's instruction in its totality we find no error. We agree with the military judge that his instruction fairly and correctly stated the law and facts of this case. R.C.M. 920(a) and Discussion; R.C.M. 920(c) and Discussion; and R.C.M. 920(e) and Discussion; *Damatta–Olivera*, 37 M.J. at 478. The military judge correctly determined and instructed that in the instant case the applicable *mens rea* standard for any affirmative defense of mistake of law, mistake of fact, or mixed mistake of law and fact raised by the appellant was "honest and reasonable."

### Combined Instructions

While the incorporation of the concept of an obedience to orders defense into the affirmative defense of mistake instruction was unique, it was dictated by the unique facts of this case. The military judge correctly determined that the evidence did not reasonably raise the affirmative defense of obedience to orders (*see* Assignment of Error V, above). The instruction's discussion of the military's emphasis on obedience to orders, protections (immunity) for those who obey all but patently unlawful orders, and the lawfulness of the orders in question was necessary and appropriate in order to place the "reasonableness" of appellant's actions into context for the court-martial panel. The military judge also: emphasized the appellant's "good character" evidence; noted that appel-

lant did not have the benefit of the judge's ruling concerning the orders' lawfulness when the appellant made his decision to disobey his commanders' orders; and provided the standard instructions concerning the court-martial panel's duties to independently decide the facts, apply the law, and to disregard any statements the military judge might have made indicating an opinion or partiality. Overall, the military judge tailored his instructions with the required "even hand." *Cf. United States v. Grandy*, 11 M.J. 270, 277 (C.M.A.1981).

### *Mens Rea* Standard

The military judge employed the correct *mens rea* standard regardless of whether appellant's asserted affirmative defense of mistake was one of law, fact, or mixed.

■ Mistake of fact is a limited defense and mistake of law is generally not a defense. R.C.M. 916(j); R.C.M. 916(*l*). In some cases, however, where a special state of mind (specific intent, willfulness, knowledge of particular facts, or premeditation) is required, a mistake of fact or law may serve to negate such a special state of mind.

■ The essence of "other" order crimes is simple noncompliance with *known* military orders. The appellant mistakenly asserts that Article 92(2)'s "knowledge" element raised this offense *in its entirety* to the status of a special state of mind offense thereby making an "honest" mistake an affirmative defense. If appellant were arguing that his mistake or ignorance went to having actual knowledge of the orders or the authority of the "orderer" to give orders, he might be correct. *See United States v. Levell*, 14 C.M.R. 624, 630, 1954 WL 2193 (A.F.B.R. 1954); *United States v. Alexander*, 11 C.M.R. 489, 492, 1953 WL 2076 (A.B.R.1953); *United States v. Brown*, 11 C.M.R. 332, 338–39, 1953 WL 2037 (A.B.R.1953). However, appellant's alleged mistake did not go to the element of having specific or actual knowledge of the order he is charged with disobeying or mistake as to the authority of the soldier giving the order to do so. Appellant knew his officers and understood their orders; appellant simply disagreed with the orders' appropriateness. *MCM*, Part IV, para. 16c(2)(c)(i).

Appellant's mistake, if he made one, was his decision that the orders were unlawful because of perceived conflicts with AR 670–1. The matter of the orders' lawfulness was not in contest because of the military judge's proper determination of their lawfulness (*see* Assignments of Error VII and VIII, above).

Because the evidence did not raise a legal or factual mistake by appellant concerning the actual knowledge element of the otherwise general intent offense of disobedience of orders, Article 92(2), UCMJ, the military judge was correct in employing the honest and reasonable standard. R.C.M. 916(j). *Cf. United States v. Peterson,* 47 M.J. 231, 235 (1997).

### *Sua Sponte* Inability Instruction (AE IV)

Appellant asserts on appeal that the defense of inability was raised by evidence that after the appellant reported in the wrong uniform to the 10 October 1995, company formation, he was removed from the formation and was thereby rendered unable to comply with LTC Layfield's 0900 hours, 10 October 1995, battalion formation UNPREDEP mission uniform order. Appellant's civilian defense counsel did not request the military judge to give an inability instruction, but that same counsel now avers that the military judge erred by not *sua sponte* giving such an instruction. *United States v. Steinruck,* 11 M.J. 322 (C.M.A.1981). We find this assertion to be meritless for many of the same reasons stated in our resolution of his obedience to orders argument, above (*see* Assignment of Error V, Compliance with CPT Palmateer's Order to Leave the Formation).

### Law

Where appellant fails to object to an instruction or to the omission of an instruction prior to the court-martial panel closing for deliberations, we review for plain error. R.C.M. 920(f). When a military judge omits a special defense instruction, the appropriate review is for harmlessness. *United States v. Barnes,* 39 M.J. 230, 233 (C.M.A.1994); *United States v. Palacios,* 37 M.J. 366, 368 (C.M.A.1993).

The military judge has an affirmative *sua sponte* duty to instruct on special defenses *reasonably* raised by the evidence even without a specific request by a party. R.C.M. 920e(3); *United States v. Gillenwater,* 43 M.J. 10, 13 (1995); *United States v. Meeks,* 41 M.J. 150, 153 (C.M.A.1994); *United States v. McMonagle,* 38 M.J. 53, 58 (C.M.A.1993). A defense is reasonably raised when the record contains some evidence to which the court-martial panel may attach credit if it so desires. *McMonagle,* 38 M.J. at 58 (citing *United States v. Simmelkjaer,* 18 U.S.C.M.A. 406, 40 C.M.R. 118, 1969 WL 6025 (1969)); *United States v. Brown,* 43 M.J. 187, 189 (1995). Regardless of the defense theory of the case, the military judge has a duty to instruct if a defense is raised; any doubt whether an instruction should be given should be resolved in favor of the accused. *McMonagle,* 38 M.J. at 58 (citing *Steinruck,* 11 M.J. at 324).

Inability "is a defense to refusal or failure to perform a duty that the accused was, through no fault of the accused, not physically or financially able to perform . . . ." R.C.M. 916(i). However, "[i]f the physical . . . inability of the accused occurred through the accused's own fault or design, it is not a defense." R.C.M. 916(i) discussion; *Meeks,* 41 M.J. at 153; *United States v. Williams,* 21 M.J. 360, 362 (C.M.A.1986). Even where a defense of inability may be available, it ceases to be available where an accused "[does] not exert sufficient effort to overcome the inability," or to take advantage of a "grace period" granted by his commander. *Williams,* 21 M.J. at 362.

"When an order requires immediate compliance, an accused's declared intent not to obey and the failure to make any move to comply constitutes disobedience." *MCM,* Part IV, para. 14c(2)(g). A mere statement of an intent to violate an order requiring future execution does not constitute disobedience of that order. *MCM,* Part IV, para. 14c(2)(g); *see generally United States v. Shivers,* 42 C.M.R. 533, 534, 1970 WL 7151 (A.C.M.R.1970); *United States v. Williams,* 18 U.S.C.M.A. 78, 39 C.M.R. 78, 80, 1968 WL 5067 (1968); *United States v. Stout,* 1 U.S.C.M.A. 639, 5 C.M.R. 67, 70,

1952 WL 2064 (1952). However, as stated above, the intentional failure to take preparatory steps necessary to comply with an order can constitute disobedience. *See also United States v. Patten,* 43 C.M.R. 820, 823, 1971 WL 12896 (A.C.M.R.1971).

■ "The requirement that the [inability] be 'through no fault of his own' is *'strictly construed'* and includes only those situations where the [inability] is 'for a reason which was out of the accused's hands.'" *United States v. Williams,* 21 M.J. at 362 (quoting *United States v. Lee,* 16 M.J. 278, 280 (C.M.A.1983)) (emphasis added).

### Discussion

■ The evidence did not raise the defense of inability. Appellant's claim fails because appellant had the ability to comply and failed to do so solely through his own fault and design. R.C.M. 916(i) discussion; *Meeks,* 41 M.J. at 153; *Williams,* 21 M.J. at 362. Appellant knowingly and intentionally reported to the company formation in the wrong uniform. Appellant admitted his personal knowledge of the orders issued by his military superiors concerning wear of the FYROM UNPREDEP mission uniform. Appellant knew that the uniform for both the company formation and the immediate follow-on battalion formation was the same. Appellant knew that the company formation was a necessary prerequisite to the battalion formation. As stated previously, appellant knew that he would not have the opportunity to don the appropriate FYROM UNPREDEP mission uniform for the battalion formation once he entered the company formation. When given a "grace period" to comply with the orders, appellant chose not to overcome any prior "inability" interfering with his obeying the orders. Appellant testified that he had no intention of complying with the orders. Consequently, the military judge did not err by not *sua sponte* instructing on that special defense. *United States v. Sellers,* 33 M.J. 364, 369 (C.M.A.1991); *Steinruck,* 11 M.J. at 324.

### Instructions Conclusion

Appellant asserts that the military judge made instructional errors of constitutional dimensions and that the findings of the court-martial should therefore be set aside. We disagree. If we were to find such constitutional error, it would be appropriate to test for harmlessness. *United States v. Langley,* 33 M.J. 278, 283 (C.M.A.1991) (citing *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986)). In the instant case, the military judge instructed the panel correctly concerning the elements of the offense. We find, contrary to appellant's assertions, that the instructions *in toto* were fair and impartial. Even were we to find that the military judge applied the wrong *mens rea* standard to the mistake defense, we would find, as the Court of Military Appeals did in *Langley,* "[i]n light of the evidence of record, ... we have no doubt that, even if correctly instructed upon, the members would have been no more ready to find the mistake honest than they were to find it honest and reasonable." *Langley,* 33 M.J. at 283. Accordingly, even if we were to find error as alleged, we would find such error harmless and affirm.

### CHALLENGE FOR CAUSE–COLONEL KWIST (AE I)

Appellant's assertion that the military judge erred by failing to grant a challenge for cause against COL Kwist is meritless.

At trial, appellant made a cursory "actual bias" challenge against COL Kwist because COL Kwist had read numerous news articles concerning appellant's case and because COL Kwist had a captain "in Macedonia on the very mission that this pertains to." [17] For the first time on appeal appellant asserts as implied bias that COL Kwist's presence on the panel "create[d] an appearance of impartiality (sic)," because COL Kwist, by inference, gave the same order to a subordinate as appellant's battalion commanders did, to "don the UN uniform and deploy to Macedonia." Accordingly, "COL Kwist [would be]

---

17. Appellant was represented at trial by two civilian attorneys and a military trial defense counsel. The civilian defense counsel who challenged COL Kwist for cause is also appellant's primary appellate defense counsel on this appeal.

judging the propriety of his own actions while sitting in judgement of [appellant]."

 A military judge's denial of a challenge for cause is reviewed for a clear abuse of discretion. *United States v. Dinatale,* 44 M.J. 325, 327 (1996); *United States v. Hamilton,* 41 M.J. 22, 25 (C.M.A.1994); *United States v. McLaren,* 38 M.J. 112, 118 (C.M.A.1993); *United States v. White,* 36 M.J. 284, 287 (C.M.A.1993). Military judges' determinations of causal challenges based on actual bias are given "great deference," because they are in the best position to "observe the demeanor of court members and assess their credibility during *voir dire.*" *United States v. Daulton,* 45 M.J. 212, 217 (1996) (citing *White,* 36 M.J. at 287). Absent a clear abuse of discretion, " '[t]here are few aspects of a jury trial where [an appellate court] would be less inclined to disturb a trial judge's exercise of discretion ... than in ruling on challenges for cause.' " *United States v. Smart,* 21 M.J. 15, 19 (C.M.A.1985) (citation omitted).

 Implied bias asserted for the first time on appeal is reviewed only for plain or obvious error. *United States v. Ai,* 49 M.J. 1, 5 (1998). The application of the concept of implied bias is limited and is a rare exception. *Chandler v. Florida,* 449 U.S. 560, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981); *United States v. Lavender,* 46 M.J. 485, 488 (1997). Precedent suggests that implied bias may exist where there is a direct nexus between the nature of the appellant or charges and the nature or status of the potential panel member: "Implied bias exists 'when most people in the same position would be prejudiced.' " *Daulton,* 45 M.J. at 217 (quoting *Smart,* 21 M.J. at 20).

Testing for both actual and implied bias, we find none. The military judge did not err in denying appellant's causal challenge against COL Kwist. It is clear from the record that COL Kwist harbored no actual bias against the accused and most certainly COL Kwist did not demonstrate any bias that would not "yield to the evidence presented and the judge's instructions." *United States v. Napoleon,* 46 M.J. 279, 283 (1997) (quoting *United States v. Reynolds,* 23 M.J. 292, 294 (C.M.A.1987)); *Dinatale,* 44 M.J. at 328.

 Applying the objective standard of whether a member of the general public would doubt the "legality, fairness, and impartiality" of the court-martial, we conclude that the denial of the challenge for cause against COL Kwist plainly passes the perception of fairness test and find no implied bias. R.C.M. 912(f)(1)(N); *United States v. Minyard,* 46 M.J. 229, 231–32 (1997); *Daulton,* 45 M.J. at 217; *United States v. Harris,* 13 M.J. 288, 292 (C.M.A.1982). Colonel Kwist merely filled a tasking from higher headquarters. He did not dictate his subordinate's uniform for the mission nor issue any orders concerning uniforms. He had no opinion on the lawfulness of the UN mission uniform. His personal involvement in the FYROM UNPREDEP mission went to the deployment of troops (a matter decided by the military judge as an interlocutory question) rather than to the mission uniform. In summary, COL Kwist's connections to the matters challenged by appellant were professional rather than personal and were not atypical of an officer in his position. *See, e.g., Ai,* 49 M.J. at 5; *United States v. Alis,* 47 M.J. 817 (A.F.Ct.Crim.App.1998).

## LEGAL AND FACTUAL SUFFICIENCY (AE II)

 Appellant's assertion that the evidence presented at trial was legally and factually insufficient to prove that he failed to obey a lawful order is without merit.[18] Appellant does not allege that he complied with the orders. Rather, he argues that the rec-

18. The specification as alleged permitted the court-martial panel to find appellant guilty of violating any or all of the following orders: 1) CPT Palmateer's order to wear LTC Layfield's prescribed FYROM UNPREDEP mission uniform to the 10 October 1995, company formation; 2) LTC Layfield's order to wear the FYROM UNPREDEP mission uniform to the 0900 hours, 10 October 1995, battalion formation; and 3) LTC Layfield's standing order that the FYROM UNPREDEP mission uniform was the battalion duty uniform from 0900 hours, 10 October 1995, until the end of the mission. We find the evidence legally and factually sufficient to prove each of the three orders.

ord is factually and legally insufficient to prove that the orders were legal. Second, he argues that his failure to comply with the orders was excused by his inability to comply as a result of his being removed from the company formation at 0845 hours, 10 October 1995. We disagree and have disposed of these issues in our determinations of Assignments of Error VII and VIII, and IV, V and VI, respectively.

Accordingly, we hold that the evidence is both legally and factually sufficient to support the findings of guilty. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Blocker,* 32 M.J. 281, 284 (C.M.A.1991); *United States v. Turner,* 25 M.J. 324 (C.M.A.1987); UCMJ art. 66(c).

## MOTION FOR A FINDING OF NOT GUILTY (AE III)

Appellant's contention that the finding of guilty to the Charge and its Specification should be set aside because the military judge erred in not granting appellant's motion for a finding of not guilty is meritless. R.C.M. 917(g).

## DECISION

We have carefully considered the remaining assignment of error and those matters personally asserted by appellant pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A.1982), and find them to be without merit. We are entirely satisfied that appellant received a fair and impartial trial. We also find that the approved sentence is appropriate. Accordingly, the findings of guilty and the sentence are affirmed.

Judge ECKER and Judge CARTER concur.